FILED
CLERK, U.S. DISTRICT COURT
4/2/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: ___TV___ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

January 2024 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>JOHN FLYNN,<br>　aka "John Hogg,"<br>　aka "John Murphy,"<br><br>　　　　Defendant. | CR No. 2:24-cr-00219-MEMF<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1349: Conspiracy to Commit Wire Fraud and Bank Fraud; 18 U.S.C. § 1343: Wire Fraud Affecting a Financial Institution; 18 U.S.C. § 982: Criminal Forfeiture] |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1349]

A.　INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

1.　Defendant JOHN FLYNN, also known as ("aka") "John Hogg," aka "John Murphy," was a member and associate of a criminal organization referred to hereinafter as "THE ENTERPRISE."  In furtherance of a scheme to fraudulently obtain money from American consumers' bank accounts, members and associates of THE ENTERPRISE engaged in, among other things, wire fraud and bank fraud.  THE

ENTERPRISE operated in the Central District of California and elsewhere.

2.   THE ENTERPRISE, including its leaders, members, and associates, constituted a group of individuals associated in fact, although not a legal entity.

3.   Members and associates of THE ENTERPRISE played different roles at different times:

   a.   Merchants:  Merchants used business entities (each a "Shell Entity") to offer to consumer-victims subscriptions for some service or product, such as cloud storage, for a recurring charge. In fact, the Shell Entities served as cover for a scheme to make unauthorized debits against consumer-victims' bank accounts (the "Consumer Bank Accounts").  Merchants purchased identifying and financial information of consumer-victims, at times through brokers, and caused unauthorized debits to be originated against Consumer Bank Accounts, many of which were held or serviced by federally insured financial institutions (the "Consumer Banks").  These unauthorized debits removed funds from the Consumer Bank Accounts and caused them to be deposited into bank accounts controlled by or for the Shell Entities (each a "Shell Entity Bank Account") at "Originating Banks," sometimes each called an "ODFI," many of which were also federally insured.

   b.   Payment processors:  Through their Originating Banks, payment processors operated some Shell Entity Bank Accounts for merchants.  The payment processors facilitated the merchants' debiting of the Consumer Bank Accounts.  These debits sometimes resulted in rejected or "returned" transactions (each a "return"), including returns based on complaints by consumer-victims that the

transactions were unauthorized.  Payment processors helped process returns and conducted other financial transactions for the merchants.

        c.    Signers: Signers served as nominal owners of Shell Entities and/or Shell Entity Bank Accounts.  Signers generally helped merchants and brokers create, open, and control the Shell Entities and Shell Entity Bank Accounts.

        d.    Lead list sources: "Lead lists" contained identifying and financial information of prospective consumer-victims, including bank routing numbers and bank account numbers.  Lead list sources generally sold lead lists (at times referred to as "traffic") to merchants.

        e.    Brokers: Brokers helped merchants find payment processors, signers, lead list sources, and other assistance.

    4.    Defendant FLYNN, a resident of Canada, was a merchant in the ENTERPRISE.

    5.    The following persons, each of whose identity is known to the Grand Jury, were members and associates of THE ENTERPRISE:

        a.    "CC A-1," a resident of Hawaiian Gardens, California, was president of a company headquartered in the Central District of California ("Company A").  Both personally and through Company A, CC A-1 was primarily a broker and at times a merchant.  Company A maintained one or more email servers located in the Central District of California that routed email communications between Company A personnel, including CC A-1 and others, and other members and associates of THE ENTERPRISE located outside this district.

        b.    "CC A-2," a resident of Huntington Beach, California, was a broker who primarily worked for CC A-1 at Company A and, at times, used a Company A email account.

3

c.   "Merchant-1," a resident of Canada and Cyprus, was primarily a merchant and at times a lead list source. Merchant-1 controlled one or more email accounts hosted by a third party located in Arizona, some of which were used by defendant FLYNN.

B.   THE OBJECTS OF THE CONSPIRACY

6.   Beginning on or about September 18, 2015, and continuing through January 2022, in Los Angeles County, within the Central District of California, and elsewhere, defendant FLYNN knowingly conspired with CC A-1, CC A-2, Merchant-1, and others known and unknown to the Grand Jury, to commit an offense against the United States, namely:

a.   to knowingly and with intent to defraud, having devised a scheme and artifice to defraud as to material matters, and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts, transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, any writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343; and

b.   to knowingly and with intent to defraud execute, and attempt to execute, a scheme and artifice to defraud financial institutions as to material matters, in violation of Title 18, United States Code, Section 1344(1).

C.   THE MANNER AND MEANS OF THE CONSPIRACY

7.   The objects of the conspiracy were to be carried out, and were carried out, in substance, as follows:

4

   a. Defendant FLYNN and other members and associates of THE ENTERPRISE bought and sold lead lists containing identifying and financial information of prospective consumer-victims.  As defendant FLYNN then knew, the lead lists were purchased for the purpose of fraudulently obtaining money from the consumer-victims by making unauthorized debits against those consumer-victims' Consumer Bank Accounts.  Defendant FLYNN and other members and associates of THE ENTERPRISE vetted lead lists through a "scrub," by making test credits ("penny" or "micro" credits) to the Consumer Bank Accounts on the lists, and through other means.  The scrubbing process would remove from the lead lists, for example, closed Consumer Bank Accounts that would cause returns on debit attempts.

   b. Members and associates of THE ENTERPRISE created, and caused to be created, Shell Entities, and obtained the use of, and controlled, Shell Entity Bank Accounts.

   c. Members and associates of THE ENTERPRISE recruited domestic signers to, among other purposes, help conceal connections between domestic Shell Entities and Shell Entity Bank Accounts and foreign members and associates of THE ENTERPRISE.  Members and associates of THE ENTERPRISE managed these signers through interstate and foreign email, messaging, and telephone communications.

   d. Using the lead lists and other sources of prospective consumer-victim information, defendant FLYNN and other members and associates of THE ENTERPRISE originated debits, and caused debits to be originated, for the benefit of Shell Entities, against Consumer Bank Accounts.  THE ENTERPRISE caused millions of dollars in unauthorized debits against Consumer Bank Accounts for the benefit of the members and associates of THE ENTERPRISE.

5

   e. To conceal and continue their unauthorized debits against Consumer Bank Accounts and conceal their returns and return rates, and continue to collect the proceeds of the fraud, defendant FLYNN and other members and associates of THE ENTERPRISE took the following actions, among others:

     i. Defendant FLYNN and other members and associates of THE ENTERPRISE created websites for some Shell Entities to give the impression those entities were providing legitimate services and products, even though, as defendant FLYNN then knew, the websites sometimes lacked functionality and few, if any, actual customers subscribed to services through them.

     ii. When a Consumer Bank, Originating Bank, or other person or entity requested proof of authorization ("POA") for a debit against a Consumer Bank Account, defendant FLYNN and other members and associates of THE ENTERPRISE created false and fraudulent documentation to be presented to the requester, claiming that the consumer-victim had authorized the debit, as a payment to a Shell Entity for a subscription for a service and product provided by the Shell Entity, by signing up for the Shell Entity's service and product through the Shell Entity's website.

     iii. Defendant FLYNN and other members and associates of THE ENTERPRISE monitored the Shell Entities' return rates and took steps to ensure that the return rates did not affect the ability of THE ENTERPRISE to continue the fraudulent debiting of Consumer Bank Accounts, including the following:

      (I) Defendant FLYNN and other members and associates of THE ENTERPRISE knew and believed that the number of returns, and a Shell Entity's percentage of returns in comparison to

6

all debits ("return rate"), often caused and would have caused scrutiny from the Originating Banks. For example, members and associates of THE ENTERPRISE knew and believed that, for Automated Clearing House ("ACH") debits, National Automated Clearing House Association ("NACHA") rules imposed certain thresholds for acceptable return rates and certain obligations on Originating Banks to monitor return rates. Defendant FLYNN and other members and associates of THE ENTERPRISE knew that high return rates could cause the Originating Banks to stop originating debits for the Shell Entities and therefore restrict the members' and associates' ability to further debit Consumer Bank Accounts.

(II) Depending on the return rates of the unauthorized consumer-victim debits, defendant FLYNN and other members and associates of THE ENTERPRISE regularly caused their Originating Banks to originate, for the Shell Entities, thousands of "micro" debits (also referred to as "affiliate" or "friendly" items or transactions) against Shell Entity Bank Accounts at other financial institutions, withdrawing a small amount of money with each debit. Since members and associates of THE ENTERPRISE controlled the Shell Entity Bank Accounts, they knew these micro debits would not result in returns and would therefore artificially suppress the Shell Entity return rates at Originating Banks to levels that, as the members and associates understood and believed, would avoid Originating Banks' scrutiny and potential termination of banking services.

iv. When some consumer-victims discovered the unauthorized debits, members and associates of THE ENTERPRISE, at times through purported "customer service" personnel, used refunds

7

and other means to dissuade consumer-victims from reporting the debiting Shell Entities to Consumer Banks, government agencies, and others.

   f. After proceeds of unauthorized debits from the Consumer Bank Accounts were credited to Shell Entity Bank Accounts, members and associates of THE ENTERPRISE caused some of the proceeds to be funneled to other Shell Entity Bank Accounts in order to fund the micro debits the members and associates of THE ENTERPRISE used to conceal and disguise Shell Entity return rates and in order to promote and prolong their scheme.  Members and associates of THE ENTERPRISE, at times, also caused some of the proceeds to be transferred from domestic Shell Entity Bank Accounts to accounts outside the United States in transactions designed in whole and in part to conceal and disguise the nature, source, ownership, and control of the proceeds.

D. <u>OVERT ACTS</u>

  8. In furtherance of the conspiracy, and to accomplish its objects, on or about the following dates, defendant FLYNN, together with others known and unknown to the Grand Jury, committed and willfully caused others to commit the following overt acts, among others, within the Central District of California and elsewhere:[1]

  <u>Overt Act No. 1</u>: On December 4, 2015, Merchant-1 emailed defendant FLYNN, asking that defendant FLYNN make sure that the lead lists they purchased included Internet Protocol ("IP") addresses for the consumer-victims.

---

[1] Unless indicated otherwise in brackets, phrases in quotation marks reproduce the original spellings, spacings, case, emphases, and ellipses.

8

<u>Overt Act No. 2</u>:  On December 7, 2015, CC A-2 sent an email to defendant FLYNN, copying CC A-1 and Merchant-1 and attaching two lead lists containing 4,024 and 13,426 leads, respectively, stating, "I would go through though and make sure the consumers age is okay with you guys.  I did notice some (only a few) that were pretty old."

<u>Overt Act No. 3</u>:  On December 30, 2015, defendant FLYNN sent an email to CC A-1, and others, in which defendant FLYNN stated, "Ok I just uploaded another micro batch 1500 orders."

<u>Overt Act No. 4</u>:  On April 6, 2017, CC A-1 sent an email to defendant FLYNN, copying Merchant-1, CC A-2, and others, regarding instructions to integrate with Company A's processing gateway.

<u>Overt Act No. 5</u>:  On February 18, 2019, defendant FLYNN sent an email to a Company A employee, attaching a false and fraudulent POA.

<u>Overt Act No. 6</u>:  On July 22, 2020, defendant FLYNN sent an email to CC A-2, in which, at Merchant-1's request, defendant FLYNN asked CC A-2 to identify a Shell Entity's correct Internet domain.

COUNTS TWO THROUGH SIX

[18 U.S.C. § 1343]

9. The Grand Jury realleges paragraphs 1 through 5 and 7 through 8 of this Indictment here.

A. THE SCHEME TO DEFRAUD

10. Beginning on or about September 18, 2015, and continuing through January 2022, in Los Angeles County, within the Central District of California, and elsewhere, defendant FLYNN, together with CC A-1, CC A-2, Merchant-1, and others known and unknown to the Grand Jury, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud financial institutions, as defined in Title 18, United States Code, Section 20, including Originating Banks and Consumer Banks, as to material matters, and to obtain money and property from the Originating Banks and Consumer Banks by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

11. The fraudulent scheme operated, in substance, in the manner set forth in paragraph 7 of this Indictment.

B. THE USE OF THE WIRES

12. On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, defendant FLYNN, for the purpose of executing the above-described scheme to defraud affecting a financial institution, transmitted, and caused the transmission of, the following items by means of wire and radio communication in interstate and foreign commerce:

| COUNT | DATE | ITEM WIRED |
|-------|------|------------|
| TWO | 12/7/2015 | Interstate email from CC A-2 to defendant FLYNN, described in Count One, Overt Act No. 2 |
| THREE | 12/30/2015 | Interstate email from defendant FLYNN to CC A-1, described in Count One, Overt Act No. 3 |
| FOUR | 4/6/2017 | Interstate email from CC A-1 to defendant FLYNN, described in Count One, Overt Act No. 4 |
| FIVE | 2/18/2019 | Interstate email from defendant FLYNN to a Company A employee, described in Count One, Overt Act No. 5 |
| SIX | 7/22/2020 | Interstate email from defendant FLYNN to CC A-2, described in Count One, Overt Act No. 6 |

FORFEITURE ALLEGATION

[18 U.S.C. § 982]

1.   Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(2), in the event of defendant FLYNN's conviction of the offenses set forth in any Count of this Indictment.

2.   Any defendant so convicted shall forfeit to the United States of America the following:

   a.   All right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense; and

   b.   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), the defendant, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has

been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

                                            A TRUE BILL

                                            _____/s/_____
                                            Foreperson

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

KRISTEN A. WILLIAMS
Assistant United States Attorney
Chief, Major Frauds Section

MONICA E. TAIT
Assistant United States Attorney
Major Frauds Section

AMANDA N. LISKAMM
Director, Consumer Protection Branch
United States Department of Justice

WEI XIANG
MEREDITH B. HEALY
AMY P. KAPLAN
Trial Attorneys
Consumer Protection Branch
United States Department of Justice